J. B. BELL ET AL., Appellants, v. CITY OF FAYETTE: GEORGE L. TODD, Mayor; B. I. LAWRENCE ET AL., Members of Board of Aldermen; TYRE W. BURTON, City Clerk, and FAIRBANKS, MORSE & COMPANY.—28 S. W. (2d) 356.

Court en Banc, May 15, 1930.

*Lionel T. Davis* and *John T. Barker* for appellants.

*D. C. Rogers* and *Edward C. Crow* for respondent city.

*Jones, Hocker, Sullivan & Angert* and *W. A. McCaleb* for respondent Fairbanks, Morse & Co.

82

WHITE, J.—This action is brought by plaintiffs as citizens and taxpayers of the city of Fayette, Howard County, Missouri, against

the City of Fayette, the Mayor, members of the Board of Aldermen, and the Clerk of said city.

The purpose of the suit was to enjoin the carrying out of a contract that defendants, the mayor and aldermen, had entered into with the defendant Fairbanks, Morse & Company, a corporation, whereby the said mayor and councilmen agreed to purchase certain Diesel engines and equipment for the purpose of operating the electric light and power plant of the said city, and to restrain the city officials from the execution of any warrants or other evidence of indebtedness to the defendant corporation under said contract, on the ground that the contract and ordinance for such purchase created an indebtedness in violation of Section 12, Article X, of the Constitution of the State of Missouri, and in violation of Sections 8479 and 8453, Revised Statutes 1919.

The defendant corporation filed a separate answer. The city of Fayette and the officers mentioned also filed a separate answer. The facts upon which the cause of action is based appear in a stipulation filed.

On March 23, 1929, Judge Woolfolk, of the Thirty-fifth Judicial Circuit, rendered judgment for the defendants, holding that the payments provided for in said contract were not violative of the said section of the Constitution and sections of the Revised Statutes of Missouri, and denied the injunction. The plaintiffs in due form appealed to this court.

The agreed statement of facts shows that, for the year 1927, the taxable property of the city of Fayette amounted in full approximately to $2,200,000; that the city of Fayette was at the time indebted in the sum of $91,000; the different items of said indebtedness were set out; that the taxes collected for the year 1928 amounted to $22,381.88; that the licenses collected for that year were $2,911.25; that the collector's commission for collecting the above amounts was $1,011.73.

It was further admitted that the total revenues and income of the city of Fayette for the year 1928 amounted to $37,541.12; that the net income from the light and power plant amounted to $5,131.55; that the gross income and revenue of the city from its water system in the year 1928 was $11,788.33; that the net loss to the city from the water system was $790.80.

It was further admitted that the municipally-owned electric light and power plant supplied power to pump the water for the water system, and that the charge made on the books of the city for that service as between the two plants, light and water, enters into the figures shown above; that during the period covered by the figures, permanent improvements upon the water plant and system cost approximately four thousand dollars; that the city for the year 1928 levied fifty cents for general purposes, six cents for

library purposes, and fifty cents for bond, interest and sinking fund, a total of one dollar and six cents on the hundred dollars' valuation.

The contract complained of begins with the proposal by the defendant Fairbanks, Morse & Company to furnish and deliver to the city of Fayette one 240 HP and 180 HP Diesel engine, together with necessary accessories, on the following terms and conditions:

"The Company proposes to furnish said machinery and materials specified herein for the sum of Sixty Thousand Two Hundred and no/100 Dollars ($60,200), to be paid at the Company's office at St. Louis, Missouri, as follows:

"It is agreed between Fairbanks, Morse & Company and the City of Fayette, Missouri, that Fairbanks, Morse & Company having installed, equipped and delivered to the City of Fayette, Missouri, certain engines, machinery and equipment in other parts of this contract more fully therein described, said City of Fayette, Missouri, hereby contracts that it will pay as purchase price for said engines, machinery and equipment, and the installation thereof, Sixty Thousand Two Hundred and no/100 Dollars, in 72 equal monthly installments of Eight Hundred Thirty-Six and 11/100 Dollars each, and which purchase price and monthly installments thereof shall be paid solely from the following described funds:

"First: There shall be paid from the income from said plant all expenses of the efficient and economical operation of said electric light and power plant.

"Second: After the payment of said operating expenses as above provided for, the monthly installments herein contracted to be paid to Fairbanks, Morse & Company shall be paid only from the amount of money which the City of Fayette, Missouri, will save in the cost of production of electricity, the saving for any month, or part thereof, to be the cost of production per kilowatt hour when the said light plant has been improved and extended in pursuance of this contract as compared with the average cost of production per kilowatt hour to the City of Fayette for the fiscal year 1926-1927, and which money so saved, or so much thereof as shall be necessary, shall be applied monthly by the City of Fayette in payment of said monthly installments, together with any interest thereon which may become due to Fairbanks, Morse & Company, and which installments and the interest thereon shall be paid only from said savings as above designated, and no other fund, money, property or assets of the City of Fayette shall be applied to the payment of said installments.

"And it is understood and agreed between the parties hereto that this agreement to pay the above mentioned sum from the income of said plant to Fairbanks, Morse & Company does not now create and shall never be held to create, any liability or general

obligation upon the City of Fayette, Missouri, and no taxes, general or special, shall ever be levied upon the property, now or hereafter, within the corporate limits of said City of Fayette, to pay all or any part of the said sum of Sixty Thousand Two Hundred and No/100 Dollars, or any interest thereon, nor shall any part of said sum ever be paid from any other fund of said City of Fayette, except that part of the income hereinabove described arising from the said electric light and power plant owned by said City of Fayette. And it is expressly agreed by the parties hereto that this contract does not in any manner pledge the credit of the said City of Fayette to the payment of the installments herein described to Fairbanks, Morse & Company, nor shall this contract ever be so construed; provided, however, if the income from said electric light and power plant is at any time insufficient to make the installment payments from said income herein provided for, then in such event it is agreed between the said City of Fayette and Fairbanks, Morse & Company that in the same ratio and proportion that the income from the City of Fayette may be reduced from what the parties hereto now estimate said income will be, the said payments to Fairbanks, Morse & Company from the part of the plant income above described shall be proportionately reduced; and if thereafter there is an increase in the amount of plant income, payments to Fairbanks, Morse & Company shall be proportionately increased, so that the intention of this contract shall be carried out, to-wit, that the part of the income hereinabove made applicable to meet installment payments herein provided for to Fairbanks, Morse & Company shall be so applied.''

The proposal further provides as follows:

''This is not a general obligation of the City of Fayette, but a special obligation, payable only from that part of the income of the electric light plant of said City of Fayette set aside by the terms of the contract between the City of Fayette and Fairbanks, Morse & Company as applicable to payment hereof, and by reference to said contract the terms thereof are, so far as regards payment hereof, incorporated herein.''

And,

''That the title and ownership of the machinery and materials herein specified shall remain in the Company until final payment therefor has been made in full, as herein provided. And in the event that any judgment is taken on account of all or part of said sums, evidenced by said hereinabove described written orders, the title to the machinery or materials hereinunder furnished by the Company shall not pass until such judgment or judgments so taken are fully paid in money and satisfied.''

Also,

''The said machinery or materials shall be and remain strictly personal property and retain its character as such, no matter whether

on permanent foundation or in what manner affixed or attached to any building or structure, or what may be the consequence of its being disturbed on such foundation, building or structure, or for what purpose the machinery or materials may be used.

"In the event of default in payment of any of the monthly installments hereinabove described, Fairbanks, Morse & Company, or its representatives, shall have the right to take possession of said machinery and equipment without process of law and sell and dispose of same to the best advantage and account to the City therefor, in accordance with the statutes of the State of Missouri relating to conditional sales of personal property.

"It is agreed between the parties hereto that if after paying from the savings, as hereinabove described, the amount due to Fairbanks, Morse & Company, a surplus arising from said savings should accumulate during the term of this contract, the City of Fayette shall have the right, at its option, to apply all or any part of such accumulated savings to any unmatured payment due hereunder to Fairbanks, Morse & Company, and if such advance payment on unmatured amount due hereunder, shall be paid, then Fairbanks, Morse & Company agrees to accept the same and credit the amount paid on the next maturing payment due hereunder and to refund to the City of Fayette interest at 6% per annum for the period of time represented by the days or months between the dates of such anticipated payment would have matured according to the terms hereof."

Other provisions of the proposal are not important on the issues here.

On September 18, 1928, the city passed an ordinance authorizing and directing the mayor of the said city and the city clerk to purchase the Diesel engines on the terms mentioned in the proposal; to pay for them the sum of $60,200 in 72 equal monthly installments of not more than $836.11 each; on default of any monthly installments they were to draw interest at the rate of six per cent Then the ordinance proceeds as follows:

". . . and the payment of said monthly installments and such interest as may become due thereon shall be paid only from the amount of money which the City of Fayette will save in the cost of production of electricity, the saving of any month, or part thereof, to be the cost of production per kilowatt hour after the plant has been improved and extended in pursuance of this ordinance and of said contract as compared with the average cost of production per kilowatt hour by the city of Fayette for the fiscal year 1926-1927, and which money so saved, or so much thereof as shall be necessary, less operating expenses of said plant, shall be applied monthly by the city of Fayette to the payment of said monthly installments, together with any interest which may become due thereon, and said installments, together with any such

interest, shall be paid only from the said savings, and from no other fund, money, property or assets of the city of Fayette; and said contract shall further provide that at no time shall any sum herein provided to be paid be paid from any levy of general or special taxes on the property of the inhabitants of the City of Fayette, Missouri, nor ever be so construed; and which said contract shall bear date of the 4th day of September, 1928, and shall bind Fairbanks, Morse & Company, to furnish and install, for the use of the city of Fayette, Missouri, the said Diesel engines and necessary equipment, apparatus, machinery and appurtenances and for the installation thereof complete and ready for operation.''
And,

''Section 3. There shall be charged to consumers for electricity furnished by the City of Fayette during the period this contract is in force and effect, and until the payments herein provided for have been made to Fairbanks, Morse & Company, such rates as are customarily charged for electricity to the inhabitants of towns and cities of like population as Fayette, Missouri, located in the State of Missouri, taking into consideration the financial condition, population, business and general conditions of the City of Fayette, compared with other cities of similar population in the State of Missouri, provided, however, that this provision as to rates shall be at all times subject to any law of the State of Missouri now or hereafter affecting the same.''

The above proposal, ordinance, stipulation and admissions were all the evidence introduced. The trial court rendered judgment holding as above set out.

I. The appellant makes the point that the agreement creates a debt within the meaning of Section 12, Article X, of the Constitution.

Section 12 of Article X of the Constitution of Missouri provides that:

''No county, city, town, township, school district or other political corporation or subdivision of the State shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose; nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness.''

It will be noted that the contract, the proposal and the ordinance, provide that the payment of the $60,200 for the purchase of the Diesel engines ''does not now create and never shall be held to

create any liability or general obligation upon the City of Fayette, Missouri, and no taxes, general or special, shall ever be levied upon the property now or hereafter within the corporate limits of the said city of Fayette to pay all or any part of said sum, or any interest thereon, nor shall any part of said sum ever be paid from any other fund of said city of Fayette, except that part of the income hereinbefore described arising from the electric light and power plant to the said city of Fayette. And it is expressly agreed by the parties hereto that this contract does not in any manner pledge the credit of the said city of Fayette to the payment of the installments herein described . . . nor shall this contract ever be so construed.''

Then follows the provision of the contract to the effect that the monthly installments mentioned shall be paid from the *saving* to the city caused by the employment of the Diesel engines, and this saving is to be arrived at by comparison of the average cost of production per kilowatt hour, to the city, with that for the fiscal year 1926-1927.

Then it is provided that if the income of the said electric light and power plant is not at any time sufficient to make the installment payments from the income in the same ratio and proportion that the income of the city may be reduced, the payments to Fairbanks, Morse & Company shall be proportionately reduced. And if there is an increase of the plant income the payments to Fairbanks, Morse & Company shall be proportionately increased. The ordinance almost verbatim repeats what is said in the proposal regarding the method of arriving at the savings from the operation of the Diesel engines which should be appropriated to the payment of the monthly installments. Then the ordinance provides that the rates charged should be such rates as are customarily charged for electricity to the inhabitants of towns of like population as Fayette, in the State of Missouri. Thus the city purchased two Diesel engines for the sum of $60,200, to be paid for in monthly installments out of what the city saved from the operation of those engines; a method is provided for the purpose of ascertaining what such savings were and that the payments were not to be made in any other way. Does that create a debt within the terms of Section 12, Article X?

This court passed upon that very question in case of State ex rel. v. City of Neosho, 203 Mo. 40. That was a proceeding by mandamus to compel the mayor of the city of Neosho to pay certain semi-annual installments arising from the earnings of the waterworks plant which the city had bought. The city agreed to purchase from the Neosho Water Company all the properties of the water company for the sum of $46,000, of which $25,000 was paid by the issuance of bonds, and $21,000 was to be paid in semi-annual installments of $875, from the net income of the plant. The right of the city to pay such in-

stallments was challenged because if the $21,000 was a debt of the city, it would increase its indebtedness beyond five per cent of the taxable property in the city, the limit fixed by the said Section 12, Article X, of the Constitution. The opinion of Judge LAMM, concurred in by a majority of the court, held that it was not an indebtedness within the meaning of that term of the Constitution. The opinion says, l. c. 82:

"We are encouraged in that view by the omission from the ordinance of any provision for a tax to pay the interest on said installments and the omission of any provision for levying a tax to create a sinking fund to discharge the principal."

That case is cited in 6 McQuillin on Municipal Corporations (2 Ed.) page 48, section 2389. McQuillin thus states the general rule:

"It has been generally held, and the rule is that the debt limitation does not apply to a debt that is a lien upon specific property, and is not chargeable to the general fund. A municipality does not create an indebtedness by obtaining property to be paid for wholly out of the income of the property. Thus, bonds issued to pay for waterworks or a light plant which provide that they shall be paid solely from the income of such works or plant do not constitute an indebtedness.

"On the other hand, water bonds, although payable solely from the receipts of the waterworks, if secured by a mortgage on the water system, constitutes an indebtedness. So if all that is proposed to be done to obtain funds to enable a municipality to own and operate a street railway is to issue street railway certificates payable solely out of revenues of the street railway property for the acquisition of which they are issued, there is no indebtedness, but if the certificates, as secured by a mortgage, are a security on valuable property of the city not derived from the issuance and sale of the secured certificates, such certificates constitute an indebtedness."

Under that section the Neosho case is cited.

It will be noted that the distinction is whether any other property of the city is liable for the payments or whether the purchase price of such improvement is to be paid for wholly out of the earnings of the improvement.

Appellant admits the general principle stated in McQuillin, but seeks to make a distinction between the Neosho case and this case, in this: that in the Neosho case the city purchased the waterworks and agreed to pay for it out of its own earnings as the city realized such earnings from the private consumers; whereas, in this case the city *owned* its power plant and the payment was to be made out of the earnings of that power plant.

Yet the contract in this case carefully and distinctly avoids that very contingency by making the payments solely out of the earnings of the Diesel engines purchased. The general revenue from the operation of a waterworks is not pledged to pay these installments.

No special or general tax could be levied for the purpose of making those payments; they can be paid only from the revenue, the savings, derived to the city from the use of these engines purchased. What it cost the city per kilowatt hour without these engines is the measure by which this earning is to be determined. The difference is what the city saves each month by the use of the engines. Whether that method to which the parties resort in order to ascertain the "savings" or earnings, is exact, or is capable of being applied, is not in question. Thus the monthly installments in this case are to be paid out of the earnings of the engines purchased, and nothing else, and the only remedy provided in the contract which the company has in case of failure to pay, is to retake the engines for failure to pay the purchase price. Though it might resort to the method employed in the Neosho case, and bring a mandamus proceeding.

From the reported cases it seems that Fairbanks, Morse & Company have sold their engines to other cities on conditions similar to those in this case. Barnes v. Lehi City, 279 Pac. (Utah) 878, is such a case. It was a proceeding in prohibition to prevent the payment of monthly installments under a contract by which the installments for the purchase price of the machinery were to be paid out of the net revenue derived from the light and power plant of the city.

It went further than the contract in this case which limits the payments to earnings of the engines. The court held that the contract for the payment of such installments did not create a debt within a provision of the Constitution similar to ours, and said, l. c. 884:

"There is a great variance in the meanings given to the words 'debt' and 'indebtedness' by the courts, in construing these debt-limit provisions, but 'a careful examination of the decisions discloses the fact that in substantially every jurisdiction the word "debt" or "indebtedness," as used in the limitation placed upon municipal power, is given a meaning much less broad and comprehensive than it bears in general usage,' " citing a number of cases, and quoting from Kasch v. Miller, 104 Ohio St. 281, as follows, l. c. 290:

"No case has been found or cited sustaining the principle that constitutional provisions against the creation of debt apply to a case where the public property was purchased or constructed by private funds and payment therefor made exclusively from the revenues derived therefrom, and from the property itself in case of default."

In Johnston v. City of Stuart, 226 N. W. (Iowa) 164, it was held that the city's contract of purchase and installing its electric light plant's oil engines equipment for cooling running water, etc., was not a debt within the constitutional limit. The title was not reserved in the seller until paid for, but by the terms of the contract it could not become a general obligation of the municipality (l. c. 167).

In Franklin Trust Co. v. City of Loveland, Colorado, 3 Fed. (2d) 114, it was held that a contract providing for the construction of a

municipal light and power plant to be paid for from the revenues of the plant, was not an indebtedness such as would come within the limitation of the Constitution.

Other cases in point are Klein v. City of Louisville, 6 S. W. (2d) 1104; City of Bowling Green v. Kirby, 220 Ky. 839; Uhler v. Olympia, 87 Wash. 1, 1. c. 4; Johnston v. City of Stuart, 226 N. W. (Iowa) 1. c. 167. The last case was where the city purchased Diesel engines as was done in this case. The court said, 1. c. 167:

"Title to the machinery was reserved in the seller until paid for, but the purchase price is not, and by the terms of the arrangement cannot become, a general obligation of the municipality. This being true, the provisions of the Constitution limiting the power of municipalities to incur indebtedness was not violated."

The constitutional limitation on the debt which a municipality may incur contemplates a debt which must be paid by resort to taxation. Such limitations are intended to prevent an increased tax upon the people. [See Barnes v. Lehi City, 279 Pac. 1. c. 885; 6 McQuillin on Mun. Corp. 2.]

The appellant cites an Idaho case, Feil v. City of Coeur D'Alene, 43 L. R. A. (N. S.) 1905. In that case the section of the Constitution with which the contract was held to be in conflict provided that no county, city, town, township, board of education or school district, or other subdivision of the state shall incur any indebtedness or liability in any manner or for any purpose, etc., exceeding, etc. Emphasis is placed upon the word *"liability"* which does not occur in our Constitution. The city here might incur liability to perform its contract and on failure to perform the remedy is pointed out: the retaking of the property. The city might be liable for failure to carry out the contract and the payment of the installments in the manner provided in the contract, and under the provisions of the contract it might be forced by mandamus, as was done in the Neosho case, to pay the monthly installments if within the limits of the savings as ascertained in the contract, but such liability would not be a debt created by the contract. The contract contemplates that its terms will be complied with.

The appellants also mention Pennsylvania cases which seem to be in their favor, and Illinois cases some of which seem to be against the general trend of authority and contrary to the general rule as mentioned in McQuillin. An examination of those Illinois cases shows that the court in some instances found that the proceeding was a scheme to defeat the provisions of the Constitution. In Schnell v. City of Rock Island, 232 Ill. 89, 1. c. 99, the Supreme Court of that state approved the general rule in these words:

"A city may acquire a system of waterworks by pledging the income until it shall pay for the system, and no indebtedness is created.

*The same rule might apply to some definite extension of the water-works where the income of the extension could be separated and applied to payment,* but an obligation to pay with the income of property already owned by the city is not different from an obligation to pay with any other funds, so far as the question whether the transaction amounts to a debt is concerned.'' (Italics ours.)

In that brief announcement the doctrine is stated which applies here. If an extension to waterworks could be paid for out of the proceeds of that extension, it would not increase the indebtedness of the city, provided the payment was limited to the earnings of that extension. In this case the total earnings of the power plant are not pledged to the payment of the monthly installments, as appellant contends, and cannot be used for that purpose. There is no lien or claim upon the general earnings from the waterworks to pay for these engines. It could be paid for only out of separate and distinct earnings of the engines purchased, which separate earnings were to be ascertained by finding how much they save to the city in their operation over and above what it cost the city with the appliances it had. That saving amounts to the earnings of the property purchased, and is within the rule approved in the Illinois case. Since there is no evidence offered, and no fact in the record to the contrary, we must assume that the plan provided in the contract for ascertaining that saving, the direct earnings of the engines, is practical, adequate and sufficient for the purpose. It is not contended otherwise. So the ordinance and contract to pay those installments in the manner provided is not a debt within the prohibition of Section 12, Article X, of the Constitution. In no event can a general tax be levied to pay the installments; these payments constitute no lien upon the power plant nor upon its revenue. It is a contingent liability which may or may not accrue. It can be paid only on the contingency that, over and above the net revenue which the city derives from the consumers of water, power, light, etc., as the plant was operated before the purchase of the engines there shall accrue an additional profit caused by the operation of the engines. There is no aspect of that situation which could make the agreement to pay in the manner provided a *debt* of the city. It is a contingent purchase, the property to be paid for only out of the net earnings which it produces: the seller takes its chance on that contingency.

II. The appellant concedes that the city of Fayette was authorized to purchase the machinery (although claiming the method of payment was improper and *ultra vires*), and for that reason a cause of action would lie in favor of the sellers of the machines against the city for the value of the property in case of default in payment: Fairbanks, Morse & Company could sue and obtain a general judgment against the city.

Whatever right to sue Fairbanks, Morse & Company would have must be measured by the terms of the contract. Appellant argues further that while a suit might not be maintained in the courts of this State, still it could be maintained in the Federal court for this purchase price. The Federal courts are bound by the terms of the contract and by the Missouri statutes and the Missouri Constitution in a case arising in this State the same as the state courts are. What sort of suit under the contract could the company bring? Certainly not one to recover a general judgment for the purchase price because the property is not sold; it is the property of the company until it is paid for. For the purpose of the argument, conceding that a suit might lie to compel the payment of the installments, such suit must be governed by the terms of the contract. It would have to be mandamus (as in the Neosho case), or an action for an accounting to compel the city, in accordance with the terms of the contract to segregate the earnings or savings of the machinery and apply it as provided in the contract. A suit in the Federal court would be governed in exactly the same way as in a state court in respect to that. If the city should entirely violate its contract so as to allow an action for damages for breach by misappropriation of the money or for any other breach, the action would not be one on a *debt* created by the contract for the purchase price. It would be an action founded on conditions not contemplated by the contract. A breach of the contract which might create a liability is not a *debt* created by the contract. Besides the remedy in such case is provided in the contract; the company could retake the machinery, remove it and have an accounting for the savings misappropriated by the city. Every possible contingency is provided for in the contract so as to prevent a general judgment against the city which would have to be paid by a levy of taxes. [Cotter v. Kansas City, 251 Mo. 224, is in point.]

III. Appellant contends that since the enactment of the Public Service Commission law a city in Missouri cannot contract to maintain certain rates for service which it furnishes to its citizens, but the entire control and management of a city plant is under the supervision of that Commission. Appellant cites Section 10425, Revised Statutes 1919, which provides for the general jurisdiction and supervision by the Public Service Commission of persons and corporations owning or operating public utilities. The only mention of municipalities is in clause 7 of the Section, excluding from the Public Service Commission jurisdiction over the service or rates of any municipally-owned water plant. The plant concerned in this case includes the furnishing of water.

Article VI, Chapter 72, relating to cities of the Fourth Class, Section 8479, Revised Statutes 1919, provides that the board of alder-

men shall have the right to maintain and operate gas works, electric light works, etc., and "to prescribe and regulate the rates to be paid by the consumers thereof."

In Article 28 of that chapter, relating to waterworks and light and power plants in cities, towns and villages, is this section:

"Section 9098. *Rates for water, lights, etc., to be fixed by Board.* The assessment and collection of rates for water, electric power, electric light, gas, or for the product or service of any other plant or works which any such city, town or village may own or operate, shall be under the control and supervision of the board of public works, when such board has been established as herein provided, subject to the ordinances of such city, town or village."

These sections cited by respondents seem to be in conflict with certain provisions in the Public Service Commission Act, relating to rates and supervision by that commission over municipally-owned utilities. But it is not necessary for us to attempt a reconciliation of such apparent conflicts, nor go into that subject in this case.

The contract here does not purport to interfere with rates. It contemplates that the city shall, by the use of the engines, furnish power at a less cost per kilowatt hour than it had been able to furnish it theretofore, and at the rates prevailing in other cities of like population. There is nothing in the contract from which it may be inferred that the rates would be increased.

IV. It is further complained by appellant that the contract allows the corporation, Fairbanks, Morse & Company, to control and operate the plant. The contract merely provides that the city agrees "to operate the plant in an economical manner and the company shall have authority to inspect the plant at any time to determine whether the same is efficiently and economically operated."

Appellants claim that this takes the control of the plant away from the Public Service Commission. The ownership of the engines remains in the company until paid for, and the right to inspect and see whether the city is living up to its contract by operating the plant in an economical manner does not give the company any right to regulate the operation of the plant, nor any supervision over it. That inspection affects the relation of the corporation to the municipality. If the Public Service Commission has any supervision, it concerns only the relation of the municipality to the consumers. It can neither make contracts nor interfere with contracts which the city makes with persons or corporations. A municipality does not have to consult the Public Service Commission every time it makes some improvement in a service plant any more than it has to consult it when it contracts for repairs on its machinery.

The judgment is affirmed. All concur, except *Walker, J.,* absent, and *Blair, J.,* in pars. 1, 2, 4 and result.